**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| ED PENNING,<br><br>                    Plaintiff,<br>        v.<br><br>THE DAILY CALLER, INC.,<br><br>                    Defendant. |

Civil Action No. 1:24-cv-02662-JDB

**PLAINTIFF'S OPPOSITION**
**<u>TO DEFENDANT'S MOTION TO DISMISS</u>**

## INTRODUCTION

This case is about Defendant The Daily Caller, Inc.'s ("Defendant") systematic and routine violation of consumers' privacy rights as established by the Video Privacy Protection Act, 18 U.S. Code § 2710 ("VPPA"). Over the past two years, Defendant has regularly disclosed its consumers' "personally identifiable information" to Meta Platforms, Inc. ("Meta"). *See* 18 U.S.C. § 2710(b)(1). This personally identifiable information includes both the consumers' Facebook IDs (sometimes called "FIDs") and URLs identifying and containing the names of the videos that they "requested or obtained" from Defendant. *See* 18 U.S.C. § 2710(a)(3). The allegations presented in the Class Action Complaint (the "Complaint") state a claim under the VPPA, as Plaintiff Ed Penning ("Plaintiff"), by and through his undersigned counsel, more fully explains below.

## LEGAL AND FACTUAL BACKGROUND

Plaintiff brings this cause of action to remedy Defendant's violations of consumers' privacy rights as established by the VPPA.

### 1. The Video Privacy Protection Act

The United States Congress passed the VPPA in 1988. President Ronald Reagan signed the legislation into law that same year. The law is designed to protect the privacy interests of consumers who request or obtain video materials from commercial providers of such services.

The VPPA defines a "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). It defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). It defines a "video tape service provider," in relevant part, as "any person, engaged in the business,

in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials. . . ." 18 U.S.C. § 2710(a)(4).

The VPPA provides that a "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided [below]." 18 U.S.C. § 2710(b). Several exceptions to violations of the law are also enumerated, none which are raised by Defendant's briefing currently before this Court.

Sub-section (c) of the VPPA states that consumers may enforce the substantive privacy right through civil litigation. 18 U.S.C. § 2710(c)(1). The remedies available to consumers include statutory damages of $2,500 per violation, punitive damages, attorneys' fees and litigation costs, and equitable relief. 18 U.S.C. § 2710(2)(A)-(D).

### 2. Factual Background

Plaintiff's Complaint alleges that Defendant is a "video tape service provider." ECF No. 1, ¶¶ 74. It details how Defendant operates the website www.dailycaller.com (the "Website") where it is "engaged in the business of selling and delivering prerecorded video materials." *Id.*; *see also id.* at ¶¶ 15, 48-56. The Complaint states that "[t]hese video materials include numerous 'Documentaries'" including titles such as "American Squatter," "Anarchy U," and "Rigged: Death of the American Voter." *Id.* at ¶¶ 49-50. A screenshot shows several tiers of subscriptions available for purchase on the Website. *Id.* ¶ 51. Only one of those tiers, the "Patriots Monthly" priced at $9.95 per month, includes access to Defendant's videos, referred to as "Award Winning Documentaries." *Id.*

The Complaint further alleges that Defendant disclosed Plaintiff's and its other consumers' "personally identifiable information." ECF No. 1, ¶ 76. It states that Plaintiff and

each of the putative class members have Facebook accounts. *Id*. at ¶¶ 8, 58, 66. It explains how each person with a Facebook account is assigned a unique, numerical Facebook ID by Meta. *Id*. at ¶¶ 3, 45. These Facebook IDs are personally identifying, according to the Complaint, because they are each indexed to an individual's Facebook account, which includes the individual's name and other personally identifying information. *Id*. at ¶ 45 (explaining how possessing a Facebook ID "allows anyone to look up the user's unique Meta profile and thus identify the user by name"). When a person with a Facebook account accesses Defendant's Website, the website sends the person's Facebook ID to Meta along with other information about the individual's activity on the page, including the page's URL, which contains the title of the video, and other information identifying the video on the page. *Id*. at ¶¶ 53-65.

The Complaint alleges that Defendant knowingly installed the Meta Pixel and used it to disclose to Meta its consumers' Facebook IDs and the names of the videos those consumers requested or obtained. ECF No. 1 at ¶¶ 1, 2, 58-60, 62-65, 77. It further alleges that none of the VPPA's exceptions apply to Defendant's conduct. *Id*. at ¶19.

## LEGAL STANDARD

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 93 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–556 (2007). A court must construe those allegations "in the light most favorable to the plaintiff." *Vick v. Brennan*, 172 F. Supp. 3d 285, 295 (D.D.C. 2016). As long as the pleadings suggest a "plausible" scenario to show that the plaintiff is "entitled to relief," a court may not grant a motion to dismiss "even if it strikes a savvy judge that . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556-557. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

A "plausible claim" under the VPPA requires a plaintiff to allege that (1) the defendant is a "video tape service provider," (2) the defendant disclosed "personally identifiable information concerning any customer" to "any person," (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by the statutory exceptions. *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015). Plaintiffs have plausibly stated a claim for a violation of the VPPA by pleading facts which, taken as true, establish each element of an offense under the statute.

Defendant makes arguments regarding the first, second, and third elements of a VPPA claim. First, Defendant argues that the Complaint does not allege that it is "engaged in the business" of renting, selling, or delivering prerecorded video cassette tapes or similar audio visual materials. Def.'s Mot., ECF No. 9-1 at 3. Second, Defendant argues that the Complaint "fails to plausibly allege that Daily Caller disclosed [Plaintiff's] video viewing information and Facebook ID [] to Meta." *Id*. at 4. Third, Defendant argues that the Complaint does not allege knowing disclosures. *Id*. Fourth, Defendant argues that the information disclosed was not "personally identifiable information" from the perspective of an ordinary person. *Id*. at 16-17.

Defendant's arguments run contrary to the plain-stated allegations in the Complaint. Courts addressing substantially similar allegations across the country have found that they easily surpass the pleading standard for VPPA claims. The Complaint alleges both that Defendant is engaged in the business of renting, selling, and delivering video materials and that Defendant knowingly disclosed its consumers' personally identifiable information to Meta. Defendant's motion to dismiss should be swiftly denied.

### 1.  The Complaint Alleges that Defendant is a Video Tape Service Provider

The Complaint plausibly alleges that Defendant is a "video tape service provider" within the meaning of the VPPA.  The VPPA defines a "video tape service provider," in relevant part, as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials. . . ."  18 U.S.C. § 2710(a)(4).  Defendant argues that it does not meet this definition because it is not "in the business" of renting, selling, or delivering of videos.  ECF No. 9-1 at 11.  But the Complaint alleges that Defendant is, in fact, in exactly that business, and courts confronting similar allegations have overwhelmingly agreed.

First, the Complaint plainly alleges that Defendant is "in the business" of renting, selling, or delivering video materials.  It states: "Defendant operates and maintains the Website (www.dailycaller.com), where it sells access to various types of pre-recorded videos."  ECF No. 1, ¶ 15; *see also id*. at ¶ 48.  Furthermore, the Complaint provides the following screenshot of an advertisement on Defendant's Website:



*Id.* at ¶ 51.  As shown above, this advertisement depicts three different subscription tiers available to potential consumers.  Neither the "Readers Pass" nor the "Founders Club" is provides access to Defendant's "Award Winning Documentaries."  *Id.*  Only the "Patriots Monthly" option includes the "Award Winning Documentaries."  *Id.*  And the "Patriots Monthly" option is significantly more expensive than the basic-level "Readers Pass."  *Id.*  Even the name "Readers Pass" marks a distinction from the video-inclusive "Patriots Monthly" tier insofar as the "Readers Pass" includes only text-based content.  These allegations alone are enough to close the book on whether Defendant is "in the business" of renting, selling, or delivering video materials.  *See Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 719 (N.D. Cal. 2023) (finding that a website which provides "brief, online video content" meets the definition of a "video tape service provider").

Additional allegations underline Defendant's status as a "video tape service provider."  For example, screenshots depict previews for documentaries on Defendant's Website which are superimposed behind buttons stating "Join to Watch":



ECF No. 1, ¶ 50.  As the Complaint alleges, and the screenshots make clear, "[t]hese documentaries on Defendant's Website are only available to paying subscribers."  *Id*.  When a non-subscriber tries to watch any of the documentaries on the Website, they are confronted with a pop-up banner (stating "You Have Reached Premium Content") and are invited to purchase a subscription. *Id*. at ¶ 56 n.26 (citing the webpage hosting the "American Squatter" documentary, https://dailycaller.com/stream/american-squatter/).

Second, courts routinely find similar allegations sufficiently allege that defendants are "engaged in the business" of renting, selling, or delivering videos.  The Second Circuit recently conducted a thorough excavation of the VPPA's language and legislative history in *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 548 (2d Cir. 2024).  Contrary to Defendant's assertions, its findings show that term "video tape service provider" ought not be construed narrowly.  *Id*.  It

wrote that "Congress cast a wide net in defining 'video tape service provider,' to ensure that businesses dealing in audiovisual goods or services satisfy the definition even if they *also* deal in non-audiovisual goods or services." *Id.* (emphasis in original). It later characterized the statutory term "video tape service provider" as "defined broadly to include even those businesses that *dabble* in video rentals . . . ." *Id.* at 549 (emphasis added). Defendant does more than "dabble" in video sales, rentals, or deliveries—indeed, videos are a central aspect of what it offers for sale. *See* ECF No. 1. at ¶¶ 50, 51.

Another recent decision presents a helpful analogue to this case. In *Golden v. NBCUniversal Media, LLC*, the court considered whether the website Today.com is a "video tape service provider." 688 F. Supp. 3d 150, 156 (S.D.N.Y. 2023). The defendant argued that it was not a "video tape service provider" because its programs are news-based and because live (as opposed to on-demand) video content is the "main feature" of its online offerings. *Id.* The court wrote that "[b]oth arguments are easily put aside." *Id.* It found the complaint plausibly alleged that Today.com met the definition of a "video tape service provider" because it alleged that Today.com allowed users to view on-demand, pre-recorded audio-visual materials as part of its business model. *Id.* As the court noted, many other cases are in accord. *See, e.g.*, *Sellers v. Bleacher Rep., Inc.*, No. 23 Civ. 00368 (SI), 2023 WL 4850180, at *6 (N.D. Cal. July 28, 2023); *see also Ambrose v. Bos. Globe Media Partners LLC*, No. 21 Civ. 10810 (RGS), 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022) (applying the VPPA to *The Boston Globe*); *Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 852 (N.D. Cal. 2022); *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2012 WL 3282960 at *6 (N.D. Cal. Aug. 10, 2012) ("*Hulu I*"); *Jackson v. Fandom, Inc.*, No. 22-cv-04423-JST, 2023 WL 4670285 at *3 (N.D. Cal. July 20, 2023); *Ghanaat*, 689 F. Supp. 3d at 720. Plaintiff here alleges the same: that Defendant allows users to view on-demand, pre-

recorded audio-visual materials as part of its business model. This Court should follow the court in *Golden*, and the numerous cases cited above, and find this is sufficient to allege Defendant is a video tape service provider.

The cases cited by Defendant are readily distinguishable. *See* ECF No. 9-1 at 11-12. The first, *In re Nickelodeon Consumer Privacy Litig.*, involved claims against Google and Viacom for providing the tracking technology at issue. 827 F.3d 262, 267 (3d Cir. 2016). That would be the equivalent of Plaintiff suing Meta here. But Plaintiff has not sued Meta; Plaintiff has sued Defendant. In the second, *In re Vizio, Inc.*, the court found that the defendant *did* meet the standard of a "video tape service provider," making this case a helpful citation for Plaintiff's position. 238 F. Supp. 3d 1204, 1221-22 (C.D. Cal. 2017). Two of Defendant's other citations are to cases involving sales of tickets to movie theaters—a far cry from the allegations here. *See Walsh v. California Cinema Invs. LLC*, No. 2:23-CV-09608-ODW (AJRX), 2024 WL 3593569, at *4 (C.D. Cal. July 29, 2024) (noting, helpfully, that "streaming platforms can clearly be distinguished from movie theaters for the purposes of the VPPA."); *Christopherson v. Cinema Ent. Corp.*, No. 23-CV-3614 (NEB/LIB), 2024 WL 4492021, at *6 (D. Minn. Sept. 17, 2024). Another involved a "sole factual allegation" that "there is more than one video on Chick-fil-A's websites," and no allegation that users paid to access those videos. *Carroll v. Chick-fil-A, Inc.*, No. 23-cv-00314-RFL, 2024 WL 1091193, at *1 (N.D. Cal. Feb. 13, 2024). Each of Defendant's remaining citations involved videos which were used to market the defendant's own products, rather than allegations that the videos *were* the products (as is alleged here). *See* ECF No. 9-1 at 11-12.[1] That is a very

---

[1] These citations include: *Cantu v. Tapestry, Inc.*, No. 22-cv-1974-BAS-DDL, 2023 WL 6451109, at *4 (S.D. Cal. Oct. 3, 2023); *Hernandez v. Jostens, Inc.*, No. 2:23-cv-05227-HDV-RAO, 2024 WL 1135165, at *2 (C.D. Cal. Feb. 7, 2024); *Cantu v. Tractor Supply Co.*, No. 2:23-cv-3027-HDV-JC, 2024 WL 1601257, at *3 (C.D. Cal. Mar. 21, 2024); *Tawam v. Feld Ent. Inc.*, 684 F. Supp. 3d 1056, 1060–61 (S.D. Cal. 2023).

different scenario than a company being "engaged in the business" of selling, renting, or delivering videos, as the VPPA requires, and as the Complaint alleges regarding Defendant. 18 U.S.C. § 2710(a)(4); *see* ECF No. 1 ¶¶ 15, 48-56.

Contrary to Defendant's allusions, the VPPA does not even require a "video tape service provider" to charge money for the video content they rent, sell, or deliver. *See, e.g.*, *Jackson*, 2023 WL 4670285 at *3 (N.D. Cal. July 20, 2023) ("video-hosting websites need not charge fees to viewers to qualify as video tape service providers under the VPPA.") (citing *Hulu I*, 2012 WL 3282960 at *7). In any event, the Complaint plainly alleges that Defendant *does* sells access to videos as part of its business model. *See, e.g.,* ECF No. 1, ¶¶ 15, 48-56. This is not a close call. The Court should find that the Complaint alleges Defendant is "engaged in the business" or selling, renting, or delivering video materials and deny Defendant's motion to dismiss. *See* 18 U.S.C. § 2710(a)(4).

### 2. The Complaint Alleges that Defendant Knowingly Disclosed Plaintiff's "Personally Identifiable Information" to Meta

The Complaint plausibly alleges that Defendant knowingly disclosed Plaintiff's "personally identifiable information" to Meta within the meaning of the VPPA. The VPPA defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). The VPPA further requires the disclosures are made "knowingly" in order to constitute a violation. 18 U.S.C. § 2710(b)(1). Defendant asserts that the Complaint does not plausibly allege a knowing disclosure of "personally identifiable information." *See* ECF No. 9-1 at 14-17.

Defendant proposes three reasons why the Complaint does not plausibly allege that it knowingly disclosed Plaintiff's "personally identifiable information." First, Defendant argues that

Plaintiff "fails to plausibly allege that Daily Caller disclosed his Facebook ID to Meta." *See* ECF No. 9-1 at 14-15. Second, Defendant asserts that Plaintiff "fails to plausibly allege that Daily Caller 'knowingly' disclosed his Facebook ID to Meta." *Id*. at 15-16. Third, Defendant claims that "Plaintiff fails to plausibly allege that his Facebook ID could be used by an ordinary person to identify him." *Id*. at 16-18. As shown below, each of these arguments is contradicted by the allegations of the Complaint and a well-developed body of case law. *See Mendoza v. Caesars Ent., Inc.*, No. 23-CV-03591, 2024 WL 2316544, at *4 (D.N.J. May 22, 2024) ("courts beyond this Circuit have reached an apparent consensus that a provider knowingly discloses personally identifiable information to a third party under the VPPA by running Facebook Pixel on its website.") (collecting cases). Defendant's motion to dismiss should be denied.

### A. The Complaint Plausibly Alleges that Defendant Disclosed Plaintiff's Facebook ID to Meta

Defendant contends that the Complaint fails to plausibly allege that the Website disclosed Plaintiff's Facebook ID to Meta. ECF No. 9-1 at 14-15. Defendant argues that "absent from the Complaint is an allegation that Daily Caller's servers transmitted the at-issue information to Meta's servers." *Id*. at 14. Even if there was such an allegation, Defendant continues, Plaintiff's claim would still fail because "nowhere in his Complaint does he allege that Daily Caller has access to, collects, or otherwise maintains control of his FID." *Id*. at 14. Tellingly, Defendant cites not a single case endorsing this argument.

Contrary to Defendant's assertions, the Complaint plainly alleges that Defendant's Website transmitted Plaintiff's Facebook ID to Meta. These allegations begin in the Complaint's opening paragraphs, which state: "Defendant has systematically transmitted (and continues to transmit today) its customers' personally identifying video viewing information to Meta using a snippet of programming code called the 'Meta Pixel,' which Defendant installed and configured on its

11

www.dailycaller.com website." ECF No. 1, ¶ 2. Plaintiff alleges that "[t]he information Defendant disclosed (and continues to disclose) to Meta via the Meta Pixel includes the customer's Facebook ID . . . ." *Id.* at ¶ 3. The Complaint then ties those allegations to Plaintiff specifically, stating "[w]hen Plaintiff purchased a subscription from Defendant and viewed prerecorded, subscriber-only videos on its Website, Defendant disclosed to Meta Plaintiff's FID . . . ." *Id.* at ¶ 12. Similar allegations follow throughout the Complaint. *See, e.g.*, *id.* at ¶¶ 44, 45, 47, 53-65.

Defendant asserts that Complaint's omission of the word "servers" is "fatal to Plaintiff's VPPA claims." ECF No. 9-1 at 14. Not so. A complaint need not recite 'magic words' to state a claim. *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 767, 2004 WL 2754653, at *11 (S.D.N.Y. Dec. 2, 2004) (holding that failure to include "magic words" does not warrant dismissal, because the pleading contained "an abundance of specific factual allegations in support of [the] claim"); *M.T. by & through Amber H. v. Uniontown Area Sch. Dist.*, No. CV 20-614, 2021 WL 807713, at *7 (W.D. Pa. Mar. 3, 2021) (collecting authorities holding that "magic words" are not required to state a claim). Here, the Complaint explains how websites with the Meta Pixel installed pick up cookies from visitor's web browsers (including cookies containing the Facebook IDs of internet users who have Facebook accounts) and transmit those cookies to Meta. ECF No. 1, ¶¶ 43-47. It alleges that Defendant intentionally installed the Meta Pixel on the Website to take advantage of "targeted advertising and other informational and analytical services offered by Meta." *Id.* at ¶ 59. It even gets technical about how the transmissions work, stating:

> Specifically, when consumers watch prerecorded videos on Defendant's Website, the Website executes a GET request to Facebook's tracking URL "https://www.facebook.com/tr" and sends it various querystring parameters and cookie values which disclose the name of the videos watched by the consumer, the URLs of the webpages hosting the videos, and the consumer's FID [e.g., Facebook ID], among other information.

*Id*. at ¶ 58.  More plain-spoken allegations to the same effect appear throughout the Complaint. *See id*. at ¶¶ 2-4, 12, 14, 59, 62, 64, 65, 77.

Defendant's next argument, that it never "possessed" Plaintiff's Facebook ID, is also contradicted by the allegations of the Complaint and has been overwhelmingly turned away by Courts considering similar contentions.  *See* ECF No. 9-1 at 15.  The Complaint explains that Defendant obtained possession of the Facebook IDs through the operation of the Meta Pixel (which the Complaint alleges Defendant knowingly installed on its Website).  *See* ECF No. 1 at ¶¶ 53-65. The Meta Pixel can "follow a consumer to different websites and across the Internet" by recognizing the cookies associated with an individual's web browser.  *See* ECF No. 1 at ¶ 45. Included in those cookies are "values" identifying the "consumer's FID."  *Id*. at ¶ 58.  Thus, Defendant possessed Plaintiff's Facebook ID through the operation of the Meta Pixel on the Website.  *Id*. at ¶¶ 12, 53, 54.

In support of its argument, Defendant attempts to introduce facts outside the allegations of the Complaint.  *See* ECF No. 9-1 at 7-8.  Courts regularly reject similar attempts to incorporate information outside the pleadings.  *See, e.g.*, *Christopherson v. Cinema Ent. Corp.*, No. 23-CV-3614 (JWB/LIB), 2024 WL 1120925, at *4 (D. Minn. Mar. 6, 2024) (finding, with respect a VPPA defendant's argument that "Plaintiff, not Defendant, transmitted the data to Meta," that the defendant "improperly relie[d] on facts not contained within the Complaint" and that its argument "therefore contradicts the standard by which the Court is to consider a motion to dismiss.").  The Court should decline Defendant's invitation to reach beyond the pleadings.  *See Harris v. Pub. Broad. Serv.*, 662 F. Supp. 3d 1327, 1334 (N.D. Ga. 2023) ("Defendant's factual arguments are not a proper basis for a motion to dismiss. If discovery reveals Defendant played no role in the

transmission of Plaintiff's information to Facebook, the Court will consider that at summary judgment.").

Courts considering this same argument on essentially the same allegations routinely deny motions to dismiss. For example, in *Belozerov v. Gannett Co.*, the court wrote that "In its motion to dismiss, Gannett contradicts the alleged facts, contending that Facebook, not defendant, placed the tracking pixel on the USA Today website." 646 F. Supp. 3d 310, 314 (D. Mass. 2022). But the court noted that "Plaintiff alleges throughout the complaint that defendant inserted the code into the USA Today website to transmit users' information to Facebook." *Id.* It held that "[s]uch a factual dispute cannot be resolved on a motion to dismiss" and that it was "plausible Gannett disclosed PII under the VPPA." *Id.*

Similarly, in *Czarnionka v. Epoch Times Ass'n, Inc.*, the defendant argued that it "did not actually 'disclose' any PII to Facebook because the Pixel is placed into a user's web browser by Facebook and sends information from the user's web browser directly to Facebook . . . ." No. 22 CIV. 6348 (AKH), 2022 WL 17069810, at *3 (S.D.N.Y. Nov. 17, 2022). The court noted that "Plaintiff alleges throughout the Complaint that Defendant itself discloses subscriber information by installing and maintaining the Pixel on its website." *Id.* The court took notice of an article cited in the plaintiff's complaint which explained how the Meta Pixel functions. *Id.* The court wrote "the relevant portion of the article states that the 'tracker'—which is to say, the Pixel—communicates with Meta's servers and transmits information about the user"—essentially the same argument Defendant asks the court to take notice of here. *Id.* It then concluded that this explanation of how the Meta Pixel works had no effect on the plaintiff's claims, observing that "[a]s alleged in the Complaint, the Pixel was installed by Defendant on Defendant's website. It is therefore inaccurate for Defendant to claim that the transmission of information occurs

'independent of any action by [the defendant].'"  *Id.*  The same is true here, where the Complaint repeatedly alleges that Defendant intentionally installed the Meta Pixel on its Website.  *See, e.g.*, ECF No. 1, ¶¶ 2, 3, 43, 77; *see also Harris*, 662 F. Supp. 3d at 1334 ("Plaintiff clearly alleges Defendant, through the Facebook pixel, sent Plaintiff's FID and the URLs of the videos she watched to Facebook.").

The Court should find that the Complaint plausibly alleges that Defendant disclosed Plaintiff's Facebook ID to Meta and deny the motion to dismiss.

### B. The Complaint Plausibly Alleges that Defendant "Knowingly" Disclosed Personally Identifiable Information

Defendant next argues that the Complaint fails to allege that it "knowingly" disclosed Plaintiff's personally identifiable information to Meta.  ECF No. 9-1 at 15-16.  However, the Complaint is replete with allegations that Defendant made the disclosures knowingly.  The Court should join the overwhelming majority of courts finding that such allegations are sufficient to allege a knowing disclosure under the VPPPA.

The Complaint alleges that Defendant knowingly transmitted personally identifiable information throughout.  For example, it states:

- "Plaintiff brings this action to redress Defendant The Daily Caller, Inc.'s ("Defendant") practice of **knowingly disclosing Plaintiff's and its other customers' identities and the titles of the prerecorded video materials to which they have purchased access to Meta Platforms, Inc.**"  ECF No. 1, ¶ 1 (emphasis added).

- "Whenever a person with a Meta account views prerecorded video material on Defendant's Website through that person's paid subscription, **the Meta Pixel technology that Defendant intentionally installed on its Website** transmits the customer's personally identifying information and detailed Private Viewing Information (revealing the specific titles of the prerecorded video material that he or she purchased) to Meta – all without the customer's consent, and in clear violation of the VPPA."  ECF No. 1, ¶ 42 (emphasis added).

15

- "**Defendant intentionally programmed its Website to include the Meta Pixel code in order to take advantage of the targeted advertising and other informational and analytical services offered by Meta.** The Meta Pixel code systematically transmits to Meta the FID of each person with a Meta account who purchases prerecorded video material on its Website, along with the specific title of the prerecorded video material that the person purchased or watched through a paid subscription." ECF No. 1, ¶ 59 (emphasis added).

- "With only a person's FID and the title of the prerecorded video material (or URL where such material is available) that the person watched with a paid subscription from Defendant's Website—**all of which Defendant knowingly provides to Meta on a systematic basis**—any ordinary person could learn the identity of the person to whom the FID corresponds and the title of the specific prerecorded video material that the person purchased or watched with a paid subscription (and thus requested and obtained)." ECF No. 1, ¶ 60 (emphasis added).

- "Defendant **knowingly** disclosed Plaintiff's and Class members' Private Viewing Information to Meta via the Meta Pixel technology because Defendant **intentionally** installed and programmed the Meta Pixel code on its Website, knowing that such code would transmit to Meta the titles of the video materials purchased by its customers coupled with its customers' unique identifiers (including FIDs)." ECF No. 1, ¶ 77 (emphasis added).

The Complaint also provides a recitation of how the Meta Pixel operates once it is installed by a website operator, explains how the Meta Pixel operates on Defendant's Website, and then states: "In these ways, among other methods, Defendant knowingly discloses to Meta the Private Viewing Information of its consumers." ECF No. 1, ¶ 58.

Courts routinely find that similar (or less comprehensive) allegations plausibly allege scienter under the VPPA. In *Li v. Georges Media Grp. LLC*, the court found that far simpler allegations sufficed to allege a knowing disclosure. No. CV 23-1117, 2023 WL 7280519, at *4 (E.D. La. Nov. 3, 2023). In *Golden*, the court found the scienter element met where the complaint alleged that defendant affirmatively installed the Meta Pixel and did so to profit from advertising and information services, with the understanding that the pixel would transmit users' information

to Meta.  2023 WL 5434378 at *8.  Many other courts are in accord.  *See, e.g.*, *Lamb v. Forbes Media LLC,* No. 22-CV-06319-ALC, 2023 WL 6318033, at *11 (S.D.N.Y. Sept. 28, 2023); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1342 (N.D. Ga. 2022); *Czarnionka*, 2022 WL 17069810 at *4; *Belozerov*, 646 F.Supp. 3d 310 at *4; *also Harris*, 662 F. Supp. 3d at 1336-37; *Feldman*, 659 F. Supp. 3d 1006 at 1021; *Frawley v. Nexstar Media Grp. Inc.*, No. 3:23-CV-2197-L, 2024 WL 3798073, at *8-*9 (N.D. Tex. July 22, 2024), *report and recommendation adopted*, No. 3:23-CV-2197-L, 2024 WL 3807700 (N.D. Tex. Aug. 13, 2024).

The two cases cited by Defendant are readily distinguishable.  ECF No. 9-1 at 15.  First, in *Mollett v. Netflix, Inc.*, the plaintiffs' allegations concerned disclosures displayed on the consumers' own televisions after they watched certain streaming content.  No. 5:11-CV-01629-EJD, 2012 WL 3731542, at *4 (N.D. Cal. Aug. 17, 2012).  The court wrote it was "unable to draw a reasonable inference from the allegations of the complaint that Netflix knew that people other than the Plaintiffs were present when it displayed PII on any individual occasion."  *Id*.  That is very different than the allegations here, which assert that Defendant purposefully installed the Meta Pixel on the Website in order to take advantage of its targeted advertising services knowing that the Website would then transmit personally identifiable information to Meta.

Second, Defendant cites a summary judgment opinion, *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1091 (N.D. Cal. 2015) ("*Hulu II*").  The plaintiffs' allegations in that very case survived a motion to dismiss, which is the relevant standard here.  *See Hulu I*, 2012 WL 3282960 at *1. *Hulu II* also involved allegations that the users Facebook IDs and the titles of the videos they obtained or requested were sent separately, and therefore required Meta to combine two separate transmission of data, whereas the allegation here is that they were delivered together in response to a single "GET" request.  *See Adams v. Am.'s Test Kitchen, LP*, 680 F. Supp. 3d 31, 43 n.3 (D.

Mass. 2023) (distinguishing *Hulu II* from Meta Pixel allegations); *see* ECF No. 1, ¶ 58.  Since *Hulu II*, courts have repeatedly rebuffed attempts to import its holding to the pleading stage of VPPA cases.  *See, e.g.*, *Lebakken*, 640 F. Supp. 3d at 1343; *Golden*, 688 F. Supp. 3d at 160 n.8; *Czarnionka v. Epoch Times Ass'n, Inc.*, 2022 WL 17069810 at *4.

The Court should find that the Complaint plausibly alleges that Defendant knowingly disclosed Plaintiff's personally identifiable information to Meta and deny the motion to dismiss.

### C.  The Complaint Alleges Defendant Disclosed Plaintiff's Personally Identifiable Information Under Both the "Ordinary Person" and "Reasonable and Foreseeable" Standards

Finally, Defendant argues that its disclosure of Plaintiff's personally identifying information should be ignored because, although the party to whom it disclosed the information – Meta – is able to personally identify Plaintiffs through this disclosure, an "ordinary person" other than Meta would not be able to do so.  *See* ECF No. 9-1, 16-17.  However, the "ordinary person" standard has *not* been adopted by the D.C. Circuit.  Even under the "ordinary person" standard, Plaintiff's Complaint specifically alleges that an ordinary person could determine Plaintiff's identity with access to his Facebook IDs.  *See* ECF No. 1, ¶ 60.  Regardless of the operative standard, Plaintiff has sufficiently alleged that Defendant disclosed "personally identifiable information" within the meaning of the VPPA.  *See* 18 U.S.C. § 2710(a)(1).

To begin, Plaintiff has alleged that an ordinary person could determine his identity with access to his Facebook ID.  The Complaint states:

> With only a person's FID and the title of the prerecorded video material (or URL where such material is available for purchase) that the person purchased from Defendant on its Website—all of which Defendant knowingly provides to Meta on a systematic basis—**any ordinary person could learn the identity of the person to whom the FID corresponds** and the title of the specific prerecorded video material that the person purchased (and thus requested and obtained). This can be accomplished simply by accessing the URL www.facebook.com/[insert the person's FID here]/.

ECF No. 1 at ¶ 60 (emphasis added).  The Complaint provides the example of Meta Chief Executive Officer Mark Zuckerberg's Facebook ID, which is reportedly the number 4.  ECF No. 1 at ¶ 45 n.21.  Thus, "logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page . . . and all of the additional personally identifiable information contained therein."  *Id*.  The same is true of anyone who has a Facebook account, which is why courts have, in the recent words of one court, "uniformly" held that Facebook IDs are personally identifying.  *See Golden*, 688 F. Supp. 3d at 159 (collecting cases); *Lamb*, 2023 WL 6318033, at *11 ("Defendant argues that Plaintiffs have not adequately alleged facts making it plausible that an ordinary person could identify an individual as having watched specific videos. However, according to recent VPPA case law, disclosure of the PII alleged here, a Facebook ID, would readily permit an ordinary person to identify the specific individual's video-watching behavior.") (internal citations and quotation marks omitted);  *Czarnionka*, 2022 WL 17069810 at *3 ("[t]he FID itself represents a particular individual."); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1342 (N.D. Ga. 2022) ("[Plaintiff] adequately alleged that [defendant] disclosed her Facebook ID and email address in connection with her video viewing information to Facebook and that the disclosure of such information constituted a disclosure of PII."); *Belozerov*, 646 F.Supp.3d at 314 (finding a Facebook ID meets the definition of personally identifiable information); *Ellis v. Cartoon Network, Inc.*, No. 14 Civ. 484 (TWT), 2014 WL 5023535, at *3 (N.D. Ga. Oct. 8, 2014) (same).  The Complaint ties these allegations to Plaintiff and the putative class members specifically by alleging that they each have Meta accounts, Facebook profiles, and corresponding Facebook IDs.  *Id*. at ¶¶ 10-13, 66, 77.  Thus, under the "ordinary person" standard, the Complaint plausibly alleges disclosures of personally identifiable information.

However, this Court need not apply the "ordinary person" standard.  That standard has not

been adopted by the D.C. Circuit or any other binding authority.  The First Circuit has articulated a different test for "personally identifiable information" which is consistent with the language of the VPPA and the Congressional aims underlying it.  *See Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016).  In *Yershov*, the First Circuit (with retired Justice Souter sitting by designation) held that the term "personally identifiable information" encompasses "information *reasonably and foreseeably* likely to reveal which . . . videos [a person] has obtained."  *Id*. (emphasis added).  Regarding the statutory definition of "personally identifiable information," it wrote "the language reasonably conveys the point that [personally identifiable information] is not limited to information that explicitly names a person."  *Id*. The First Circuit gave the term "personally identifiable information" a succinct and persuasive reading through textual analysis, legislative history, and colloquial sports analogies.  *Id*.  Building on an example concerning the numbers on football players' jerseys, it wrote that "when Gannett makes such a disclosure to Adobe, it knows that Adobe has the 'game program,' so to speak, allowing it to link the GPS address and device identifier information to a certain person by name, address, phone number, and more."  *Id*.; *see also Robinson v. Disney Online*, 152 F. Supp. 3d 176, 182 (S.D.N.Y. 2015) (stating that allegations of a "correlated look-up table" that would "enable Adobe to link the hashed serial number of [the plaintiff's] Roku device and his viewing choices to his identity" would satisfy the personally identifiable information pleading standard.).  Consistent with this approach, Plaintiffs have alleged Meta's ability to easily link Facebook IDs to individual identities, as well as Defendant's knowledge thereof.  *See, e.g.*, ECF No. 1, ¶ 43 ("[t]o create a Meta account, a person must provide, inter alia, his or her first and last name, birth date, gender, and phone number or email address."); ¶ 45 (quoting Meta's developer guide as stating that "a Meta Pixel installed on a company's website allows Meta to 'match [] website visitors to their respective

Facebook User accounts.'"); *see also Li*, 2023 WL 7280519, at *4 ("[M]any courts have found that FIDs constitute PII under the statute. At the very least, Meta can easily 'link' the FID to a specific user.").

In sum, the Complaint plausibly alleges that Defendant disclosed Plaintiffs' and the putative class members' personally identifiable information under either the "ordinary person" or "reasonable and foreseeable" standard.

Defendant's motion to dismiss should be denied.

## CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that the Court deny Defendant's motion to dismiss in its entirety and, in the alternative, provide leave to amend if the Court grants the motion.

Respectfully submitted,

Dated:   December 23, 2024          **HEDIN LLP**

/s/ Tyler K. Somes
Tyler K. Somes
District of Columbia Bar No. 90013925
HEDIN LLP
1100 15th Street NW, Ste 04-108
Washington, D.C. 20005
Telephone:      (202) 900-3332
Facsimile:      (305) 200-8801
tsomes@hedinllp.com